

**FILED**

JUL 0 7 2020

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. **20 CR 088 CVE** |
| Plaintiff, | ) |
| | ) **INDICTMENT** |
| v. | ) [COUNT 1: 18 U.S.C. § 1344 – Bank Fraud; |
| | ) COUNTS 2 through 5: 18 U.S.C. § 1014 – False Statements to a Financial Institution] |
| BENJAMIN HAYFORD, | ) |
| Defendant. | ) |

**THE GRAND JURY CHARGES:**

### COUNT ONE
### [18 U.S.C. § 1344]

1. From in or about March 2020 through in or about April 2020, in the Northern District of Oklahoma and elsewhere, the defendant, **BENJAMIN HAYFORD**, knowingly executed, and attempted to execute, a scheme and artifice to defraud financial institutions and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, financial institutions, by means of false and fraudulent pretenses, representations, and promises, as stated below ("the Scheme"):

### The Purpose of the Scheme

2. The purpose of the scheme was to enrich **HAYFORD** unlawfully by obtaining loan proceeds from financial institutions under false and fraudulent pretenses concerning the nature and operation of **HAYFORD**'s businesses.

## Manner and Means of the Scheme

3. To achieve the purpose of the Scheme, **HAYFORD** used the following manner and means, among others:

### *The Defendant and Related Entities*

4. **HAYFORD** was a resident of Centerton, Arkansas.

5. Global Policy & Strategy Partners, LLP ("GPSP") was a general partnership registered with the Secretary of State for the State of Texas on or about April 1, 2020. **HAYFORD** held a majority interest in GPSP.

### *The Small Business Administration*

6. The United States Small Business Administration ("SBA") was an agency of the United States government. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

7. As part of this effort, the SBA enabled and provided for loans through financial institutions, such as banks and credit unions, and through other lenders. SBA loans commonly had some form of government-backed guarantee for the benefit of the lender.

### *The Paycheck Protection Program*

8. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of

forgivable loans to small businesses to preserve jobs by paying for certain expenses. This financial relief was referred to as the Paycheck Protection Program ("PPP").

9. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, designated as an SBA Form 2483, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its number of employees and average monthly payroll expenses. These figures, among other factors, determined the amount of money the small business could borrow under the PPP. In addition, businesses applying for a PPP loan were required to provide documents showing their payroll expenses.

10. A PPP loan application was processed by a participating lender, which often was a financial institution such as a bank or credit union. In the course of processing the loan, the lender transmitted data from the borrower's application, including information about the borrower, the stated number of employees and payroll figures, and the total amount of the prospective loan, to the SBA. If approved, the lender funded the PPP loan using its own monies, the repayment of which was guaranteed by the SBA.

11. PPP required loan proceeds to be used only for certain expenses, including payroll costs, mortgage interest, rent, and utilities. Under PPP rules and guidance, the interest and principal on a PPP loan was eligible for forgiveness if the borrower spent the

loan proceeds on these expenses within a designated period and used a certain portion of the loan proceeds for payroll expenses.

***The Financial Institutions***

12.    Bank A, known to the Grand Jury, was a financial institution within the meaning of Title 18, United States Code, Section 20, being an insured depository institution and a member of the Federal Home Loan Bank system.  Bank A was based in Fayetteville, Arkansas, and maintained branches throughout the United States, including the Northern District of Oklahoma.  Bank A was authorized by the SBA to make PPP loans to eligible borrowers.

13.    Bank B, known to the Grand Jury, was a financial institution within the meaning of Title 18, United States Code, Section 20, being an insured depository institution and a member of the Federal Home Loan Bank system.  Bank B was based in the Northern District of Oklahoma.  Bank B was authorized by the SBA to make PPP loans to eligible borrowers.

***HAYFORD's Fraudulent PPP Loan Applications***

14.    To obtain PPP loans fraudulently, **HAYFORD** submitted to Bank A and Bank B certain application forms that materially misrepresented the history, nature and operations of GPSP.

15.    To support the fraudulent application forms, **HAYFORD** submitted to Bank A and Bank B certain documents that purported to confirm the information in the applications but which, themselves, contained material misrepresentations about the employees, payroll figures and taxes pertinent to GPSP.

*HAYFORD's Bank A Loan Application*

16. On or about April 1, 2020, **HAYFORD** falsely represented to Bank A that GPSP operated as a sole proprietorship from May 2018 to December 2019, and that its business structure changed and it became a new entity effective January 1, 2020, when in fact, as he then knew, GPSP partnership agreement was not signed until in or about April 2020.

17. On or about April 3, 2020, **HAYFORD** submitted a materially false application to Bank A for a PPP loan to GPSP in the approximate amount of $4,472,468. In the loan application, **HAYFORD** falsely:

   a. Represented that GPSP had 244.17 employees and an average monthly payroll of $1,788,987.50;

   b. Certified that GPSP was in operation on February 15, 2020, and at that time had employees, for whom it paid salaries and payroll taxes, and independent contractors, for whom it paid wages as reported on Forms 1099-MISC; and

   c. Submitted documents that materially overstated the number of GPSP employees and amounts of payroll expenditures, by falsely representing:

      (1) In a PDF file, that GPSP paid wages of $1,904,325 in January 2020 and $1,673,650 in February 2020 to 247 of 250 employees;

      (2) In a letter dated January 31, 2020, that GPSP distributed a total of $1,904,325 in cash payments to 247 1099-MISC contract employees for 44,370 hours; and

(3)  In a letter dated February 28, 2020, that GPSP distributed a total of $1,673,650 in cash payments to 247 1099-MISC contract employees for 39,050 hours.

*HAYFORD's Bank B Loan Application*

18.  On or about April 9, 2020, **HAYFORD** submitted a materially false application to Bank B for a PPP loan in the approximate amount of $4,472,468 to GPSP. In the loan application, **HAYFORD** falsely:

a.  Represented that GPSP had 244.17 employees and an average monthly payroll of $1,788,987.50; and

b.  Submitted documents that materially overstated the number of GPSP employees and amounts of payroll expenditures, and the date of the partnership's formation, by falsely representing:

(1)  In a PDF file, that GPSP paid $1,904,325 in January 2020 and $1,673,650 in February 2020 to 247 of 250 employees;

(2)  In a document purporting to be a partnership agreement, that **HAYFORD**, a friend of his, and a "Hayford Family Trust" formed GPSP on January 1, 2020.

19.  On or about April 20, 2020, during a telephone conversation with a Bank B representative located in the Northern District of Oklahoma, **HAYFORD** falsely represented that:

a.  GPSP clients realized yearly revenues between several hundred million and a billion dollars;

  b.  GPSP had 247 W-2 employees; and

  c.  The GPSP partnership agreement was signed effective January 1, 2020.

  20.  On or about April 21, 2020, at approximately 4:44 p.m. Eastern Time, **HAYFORD** submitted documents to Bank B that materially overstated the number of GPSP' employees and amounts of payroll expenditures by falsely representing:

  a.  In a letter dated January 31, 2020, that GPSP distributed a total of $1,904,325.00 in cash payments to 247 1099-MISC contract employees for 44,370 hours during January 2020;

  b.  In a letter dated February 28, 2020, that GPSP distributed a total of $1,637,650.00 in cash payments to 247 1099-MISC contract employees for 39,050 hours during February 2020; and

  c.  In an Excel file, payroll figures for the months of January and February 2020 the same as those stated in the letters dated January 31, 2020, and February 28, 2020.

  21.  On or about April 21, 2020, at approximately 5:05 p.m. Eastern Time, **HAYFORD** submitted documents to Bank B that materially overstated the number of GPSP employees as well and amounts of payroll expenditures by falsely making the same representations alleged in paragraph 20 of this Indictment, except that the GPSP employees were described as being "W-2" employees, rather than "1099-MISC" employees.

**The Executions of The Scheme**

  22.  On or about the dates stated below, HAYFORD executed, and attempted to execute, the Scheme in the manner described below:

7

a. On April 9, 2020, **HAYFORD** submitted a PPP loan application to Bank B, as alleged in Paragraph 18 of this Indictment;

b. On April 20, 2020, **HAYFORD** had a telephone conversation with a Bank B representative, as alleged in Paragraph 19 of this Indictment;

c. On April 21, 2020, **HAYFORD** submitted documents to Bank B, as alleged in Paragraph 20 of this Indictment; and

d. On April 21, 2020, **HAYFORD** submitted documents to Bank B, as alleged in Paragraph 21 of this Indictment.

All in violation of Title 18, United States Code, Section 1344.

## COUNTS TWO THROUGH FIVE
## [18 U.S.C. § 1014]

23. The allegations of Counts One through Four of this Indictment are incorporated in these Counts by reference.

24. On or about the dates stated below, in the Northern District of Oklahoma and elsewhere, the defendant **BENJAMIN HAYFORD**, knowingly made the following false statements with the intent to influence the actions of Bank B, a financial institution located in the Northern District of Oklahoma, the accounts of which were insured by the Federal Deposit Insurance Corporation ("FDIC"), upon an application for a loan:

| Count | Date | Statement |
|---|---|---|
| 2 | 04/09/20 | **HAYFORD's** statements contained in his submission of PPP loan application to Bank B, as alleged in Paragraph 18 of this Indictment |
| 3 | 04/20/20 | **HAYFORD's** statements made in his telephone conversation with Bank B representative, as alleged in Paragraph 19 of this Indictment |
| 4 | 04/21/20 | **HAYFORD's** statements contained in his submission of documents to Bank B, as alleged in Paragraph 20 of this Indictment |
| 5 | 04/21/20 | **HAYFORD's** statements made in his submission of documents to Bank B, as alleged in Paragraph 21 of this Indictment |

All in violation of Title 18, United States Code, Section 1014.

R. TRENT SHORES  
UNITED STATES ATTORNEY

A TRUE BILL

_____  
Victor A.S. Regal  
Assistant United States Attorney

/s/ Grand Jury Foreperson  
Grand Jury Foreperson